And with respect to the first two cases, which are immigration cases, council have agreed to handle them jointly as tandem arguments, and we'll hear first from Mr. Peng. Thank you, good afternoon, your honors. May it please the court, John Peng on behalf of petitioners Gilberto Lopez and Jan Michael Antonio Deere. Your honors, this case presents a straightforward question of law. Whether New York's definition of narcotic drug is categorically broader than the federal definition. As this court answered yesterday in Gibson, the answer is plainly clear, yes. I'd like to start with the three opiate derivatives because I think that's the basis for Gibson's holding, naloxagol, naldemidine, the Bain-derived butorphenol. Yesterday's Gibson opinion really reinforces the conclusion that we've asked this court to reach, which is that on these three schedule two opiate derivatives New York does not exclude them from regulation, meaning they remain under regulation, while the Federal Controlled Substances Act has explicitly excluded them. These three substances therefore prove there's a categorical mismatch, and the conviction under New York for a narcotic drug cannot sustain the grounds of removability sustained by the agency. One of the things that puzzled me is that the whole purpose of the categorical approach is that you can look at the statute, line it up, you don't have to get into evidence and the specifics, and putting aside yesterday's decision, it seems like in this case, the understanding as to whether there's a mismatch depended in part on expert testimony, and I'm trying to figure out whether we look at that expert testimony as factual or just helping illuminate our understanding of what is fundamentally a legal conclusion? Your Honor, I believe it's closer to the latter. I think in these cases, the expert testimony was provided to almost bolster the argument regarding the cocaine and the opiate isomers. So I don't think they really address the opiate derivatives that we talk about that are explicitly mentioned by name in the federal schedule. They also don't talk about the three methyl fentanyl isomers, which I think New York is quite clear, they regulate only the geometric isomers, not the, they regulate geometric and optical, while the federal only regulates the optical. But so the expert opinion, I think, only supplies that added description of what the isomers mean. I think the science is a little complicated, and I think that's what the expert reports were meant to do. If we look at it from the statutory basis, and if I could turn now to the cocaine isomers, the statutory interpretation question here, I think, is quite clear. New York says we regulate cocaine, its isomers, and its salts of isomers. By not adding the adjective modifier to isomers, the logical conclusion is New York intended to regulate all of cocaine's isomers. We further have support in the legislative history. In the 1978 amendment memorandum, the sponsoring assembly person said, New York, we don't wanna be in the business of trying to identify which isomer of cocaine a criminal defendant might possess. We wanna just legislate for the entire field. All of cocaine and its isomers, we wanna capture that so that different jurisdictions, maybe in rural parts of upstate New York, don't have to purchase this expensive polarimeter equipment to be able to test for the isomer. But Congress, I think, has taken a different tack. They've decided that we wanna regulate optical and geometric isomers of cocaine. It's clearly spelled out. But we don't wanna regulate the constitutional isomers. So I think just on those clear statutory differences, we can glean that on cocaine isomers, there's the mismatch. That conclusion has been reached by many now district judges in this circuit. It was also recently reached by the Eighth Circuit in United States versus Owen. There they were reviewing the Minnesota statute that was almost identical to the New York statute here, where Minnesota says we regulate cocaine, its isomers, and its salts of isomers. And the Eighth Circuit confirmed  shows that all isomers of cocaine is regulated in Minnesota, making it an over-breath to the Federal Controlled Substances Act. Could you address the effect of the Federal Analog Act on how we should look at both the universes of isomers that are controlled in the state and the federal contexts? Yes, certainly, Your Honor. The Federal Analog Act, I believe, does provide just a red herring for this analysis. And the reason, I think, the strongest reason, I suppose, is this idea of the rule against surplusage. So if we assume that the Federal Analog Act could capture, let's say, the constitutional isomers of cocaine, it would really mean that Congress was doing a whole lot of nothing when it was trying to say we want to regulate the optical and geometric isomers of cocaine, because the Federal Analog Act would otherwise cover or sweep in these additional isomers. I think the natural reading is to say that Congress meant what it said and said what it meant when it wanted to regulate just the optical and the geometric isomers of cocaine and not the constitutional isomers. I think that the second reason we provided in our brief is just on the definition itself. So 21 U.S.C. 802 provides the different definitions. For controlled substance analog, it says it's a substance that is not defined as a controlled substance. Controlled substance is defined as anything identified in Schedules 1, 2, 3, 4, or 5. And so I think when we look at cocaine being already in Schedule 2, that means Congress has kind of told us that we don't want the Federal Analog Act to really disturb our existing definition of cocaine and the isomers. And recognizing that you've only had 24 hours or even less to look at Gibson, which was issued yesterday, could you address the concern that Gibson was a case in which the government really focused on the timing, when we're supposed to look at whether there was a match between the federal and state definitions of controlled substances and that the government didn't really engage with the very arguments that you're making here. And so I don't know to what extent the question was fully briefed in that case, and we purported to answer it in a way, but it's kind of still in an even so, even assuming arguendo kind of context where we made a decision really that focused on timing. Is that, what's your view about how we should read Gibson, please? Right. I think Your Honor is correct that in Gibson, the issue really didn't come up, at least on appellate review before this court. I think that was because the government had conceded that naloxonegal was regulated under federal, was exempted from federal regulation, but not exempted from New York, creating the statutory overbreath. Were they really conceding it explicitly, or were they just saying, listen, we're not gonna even engage with that because you're looking at the wrong time. And so we don't even have to really consider whether they were the same, whether they're categorical match or not. Right. And I suppose, and I try to briefly read up on it. I do think Judge Kearse was quite clear in saying that the government had really not challenged these points. I think that's similar to what we have here where I don't think the government ever really challenged these purported factual issues that they have now raised for the first time before this court. And so that were two layers of review by the IJ, the BIA, where the government didn't really make those kind of arguments. And I think that yesterday's opinion, I think really spoke to just what can we glean from the DEA deciding to deregulate naloxonegal, naldehyde, and the bain-derived butorphanol, and they looked at the federal registered deregulation notices where DEA really spells out that these were scheduled to opiate derivatives because they could be derived from opium and they have the addiction quality that's produced, that's required. And then the DEA made a judgment that we don't want to regulate them anymore. New York has not made that judgment. And so I think yesterday's opinion really just shows that the deregulation notices can give this court confidence that these substances are opiate derivatives under New York regulation, but not under federal. Thanks very much, Mr. Peck. You've been here some time, but even before you sit down, I want to emphasize that we're going to give counsel on both sides an opportunity to submit supplemental letter briefs, which might help us understand this situation. All right, well, thank you. But we thank you very much for your argument. Mr. Zaidi. Good morning, Your Honors, and may it please the court. Imran Zaidi for the Attorney General. I'd like to start with Gibson because that is obviously the most recent development that has added some excitement to these proceedings. And it's helpful to know, Your Honor, that we will have the opportunity       I'd like to start with Mr. Zaidi for the Attorney General. I'd like to start with Mr. Zaidi to figure out what to make of that decision, how it might impact here, and then, of course, specific to that case, whether or not to seek further review. And as you might expect, we haven't made any of those decisions so far. You, of course, both have probably read the famous opinion by Justice Alito, which is sometimes referred to as the road to Zagreb case. So you understand and appreciate the complexity of all of this. Yes, no, there's no question, Your Honor. So while we work on what to do with Gibson, both in that case and how it might affect this, and again, we'll submit that supplemental briefing and we welcome and we're happy to have the opportunity to do that. I think for present purposes, we want to say that Gibson very clearly did not address with any reasoning the issue of drug divergence between the New York and federal schedules. The case relied solely on the fact that the government had not contested that issue below and therefore was constrained from raising it on appeal to be very clear, Your Honor, the government did not at any point concede divergence. The government just simply did not contest it below and instead asked the court, both the district court and this court to resolve the case based solely on the timing of the comparison between schedules. So that then brings us to where we were in this case. And here, it's perhaps even, I think, sending it back for more fact-finding and development of issues is even more warranted than in Gibson. And that's because here, the agency clearly, and the parties agree on this, resolved this case based solely on this court's decision in Pasquale. But I'm having a lot of difficulty understanding how this would be a factual question and certainly a question as to which the agency would have any expertise in the relative scope of the State Controlled Substances Act and the Federal Controlled Substances Act. This is a matter of chemistry and some legislative history. And it seems to me that there aren't contested expert reports, there aren't dueling experts, there's, you know, I don't see anything to be gained by having the agency look at it. What is the nature of their expertise or the facts that would be found that are not appropriate for us to consider in the first instance? Yes, Your Honor, it's an important question. And I think the simple answer is, in construing state law, to determine what elements would be part of this offense, in construing what New York means by narcotic drug, that would be a legal question. But there are several underlying factual questions as to what isomers, even assuming the New York statute covers these additional isomers of cocaine, whether those in fact exist, which is the answer that, of course, Rodriguez-Gamboa in the Ninth Circuit answered as to meth in the negative. And other circuits like the 11th with Shamu have addressed cocaine's positional isomers, the same ones that petitioners here assert are overbroad. There, they also said those are factual questions and you cannot just posit them without supporting them with factual evidence. But here we have a very general statement that the New York State Legislature intended to have a very broad and different approach from the federal to its definition of narcotics, I guess. And it seemed to have a different intent. And that's fairly well documented here about what it wanted the scope of the New York State statutes to be. And that is at odds with the changing Federal Controlled Substances Act enlist, and how the DEA goes about consulting with the FDA and enlisting the covered substances. So there's already a significant diversion, it seems to me, without getting even to the areas of chemistry that I really know very little about myself, which I think have been fairly persuasively demonstrated to be different in the federal and state context. Well, yes, Your Honor. So there's a few different classes of overbreath that are alleged here. So it depends on which one you're talking about. I was speaking of isomers before. So there's sort of four classes of arguments here. Three of them relate to isomers. That's isomers of cocaine, isomers related to opium and opiate derivatives, and then isomers of 3-methylphenol, a specific opiate derivative. For those, all of what I said before applies. The questions regarding what isomers exist, and then separately, whether New York means to control them, and then the assemblyman's words, all of those things would come into play. The separate question of three specific drugs, this is naloxagol, naldemidine, this is the issue that Gibson addressed. So the isomers arguments and the factual development doesn't apply as much there, but it is still a separate factual question. So as to those three- And didn't we answer the question about naloxagol already in Gibson, and isn't that enough for here? So no, Your Honor. That is first the question we were trying to work through in terms of further review for Gibson. So we don't know what we're doing with that yet. Even setting that aside, it very clearly did not answer that question. It assumed that the issue was resolved based on the fact that the government had not contested it, and there is no question that I submit petitioners could not contest that anything about how those schedules diverged, what science went into that, what New York meant to control, none of that was briefed, I can assure you of that, and certainly none of that was in the Second Circuit's decision in Gibson. So, and that question, again, is separate from isomers. But wasn't there this naloxagol delisting rule that applied in one context and not in the other, applied in the federal and not in the state? That's correct. And doesn't that itself just create the non-congruence between the two statutes? It does not, Your Honor, and this is a very important point to make. When we were talking about the categorical approach and you're comparing schedules, there's a significant distinction between a situation where you look at a state list of drugs that explicitly includes a drug, or in any context, whether drugs or otherwise, and a situation like this, where you have a federal schedule excluding something and no parallel exclusion in state law. This is what sometimes is referred to as silence in the Supreme Court, and Moncrief said in those situations, to interpret that silence, to understand what the state actually means to include, you turn to the realistic probability test. Now, there's no question they have not satisfied that here. They haven't identified any case where New York has actually prosecuted any of those drugs. We only look at that if there's an ambiguity, right? We don't get to realistic probability unless we find an ambiguity in the statute, and they're saying there is no ambiguity. That's what they're saying. That is what we disagree with, and that's because, again, if you are relying only on the proposition that the federal law excludes these things, that federal law defines as opiate derivatives, but New York does not exclude them, then you still need to answer the question of whether New York includes them. And that means- Isn't that a legal question, though? I mean, this idea that we need fact-finding on what's in New York's list feels odd to me. I don't think it is, Your Honor. I think the ultimate question is legal, and we don't resist that, but I think, as with many legal conclusions, there are underlying factual questions to be heard and found, and one of those is whether isomers exist in the isomer context, and here the questions would be whether any of these three substances, and to be clear, it would be a substance-specific analysis, actually meets the definitions of opiate and derivative, which are, derivative is not defined in New York or federal law, and to meet the definition of an opiate, you would need to show that it has a sort of addiction-forming or addiction-sustaining liability, similar to morphine, or being capable of converging into such a drug. Did you all present, you're identifying these as factual issues, usually a factual issue. I assume that means one side says this is the facts, and the other side says, no, this is the facts, and here's our basis for saying that. Are you saying, oh, this is an issue, or this is an issue about which we have a contrary view? We don't actually think that isomers of cocaine other than optical and geometric exist, and that's our litigation position. So the problem, and the reason the answer to that is complicated is because there are these four different classes, the answers to that question sort of turns on which class you're talking about. All right, let's say cocaine. Is it your position that the, or cocaine derivative, I forget. Is it your position that optical and geometric, you're not hiding from the mismatch in the language of the statutes, right? If there was a category of isomers that were not geometric and optical, I don't think you're arguing that those wouldn't be included in New York, but not in the federal. Well, even there, Your Honor, we would say, first, New York just has isomers. This is not like, for instance, the Seventh Circuit in Ruth, even the Eleventh Circuit in Shamu looked at a statute that said positional. So yes, we would, on the language, we would. We would still have an argument there, but yes. But your argument would be to us. Correct. It would be a legal argument. You might give a Brandeis breeze that tried to explain the basis for it, but you wouldn't. Right. The statutory interpretation argument would 100% be legal, Your Honor. Your Honor, you are correct there. If our argument, as is one of our arguments here, is that even if this statute, the state statute, does expressly include these overlisted isomers, positional isomers, in the federal law, it does not. Yeah. And just to give you a perfect analogy for what I'm talking about right now, this is just like Rodriguez-Gamboa, right? You have a state statute that does list an additional type of isomer in that context as methamphetamine. We were arguing that, yes, it is facially overbrought as a legal matter. As a factual matter, to give meaning to that facial overbreath, you need to show that that actual isomer exists. And there it did not. And that's what, for us, in certain- And whose burden is that? Pardon me? Whose burden is that? I mean, is that the government's to say it doesn't, or is that theirs to say it does? When you are raising what you are claiming to be ambiguity in the statute, then that is a realistic probability test, and that is a petitioner or a defendant's burden. And I see that my time has been up, but I'm happy to answer more questions. Did the GIA bring any special expertise to the kind of factual determinations that you're saying need to be made? No, Your Honor, and I meant to answer this question before. It's an important question, too. There's two separate reasons that we're asking for remand. Mainly, it's for the factual resolution of these issues, and no, there's no expertise there on the factual scientific chemical questions, for sure. We do not claim that. It is of the quintessential role of the immigration judge here to view the significance of these facts, to view the weight of the expert opinion. That's not about agency expertise in interpreting immigration statutes. There is one argument that the government did raise below that the Immigration Judging Board did not address relating to, relates to, that language in the immigration statute. That is something that the agency should have a first shot at interpreting, but that's only one small slice of the government's argument here. It's mainly about facts. I'm sorry, what is that question, that they should have a first shot? And the question is, for one of the two immigration grounds at issue that in both of these cases, which is whether or not a substance, somebody has had a conviction for an offense relating to a controlled substance, the question would be what relates to mean, and whether relates to can bring in to what would otherwise be an overbroad comparison or an overbroad statute, whether that relates to language is more expansive and wouldn't require a strict categorical approach. And that's an argument that this court, or rather the Supreme Court has already recognized has some force in Maluli. That's it for Mr. Pan. Thank you, Your Honor. Thank you. Then I'll give you the schedule for the supplemental letter briefing. Okay, thank you, Your Honor. I'd like to hopefully try to get through five main points. First from the start, the relating to language. I think that argument is one, a question of law, and two, I think it's foreclosed by both Maluli and Harbin, where the Supreme Court and then this court respectively have said that when you're looking at controlled substance context, you really need to match up a state drug with a federal one in the Controlled Substances Act. Because then if we try to broaden that on relating to, it would then cover all these, again, substances that Congress has told us we don't think warrant federal regulation. So if constitutionalized mers can still be served as a relating to drug, then it would really defeat the purpose of the Controlled Substances Act. On the burden, Judge Carty, your question, I think the government has put the cart before the horse here, because in Jack and Williams, this court has said that where there's a facial overbreath, the textual difference is fatal, and we don't look at the realistic probability test. We assume that the state regulates based on how they've provided to us in their statutes. And so I think the burden question really does shift also on the Supreme Court's guidance in Pareto, where below when the government has a burden to establish removability, it's really on them to prove the categorical match. Going through the substances that the government raises, so first on cocaine. So the government suggests that the constitutionalized mers of cocaine might not exist. Nevertheless, in their brief, they've asked us to look at Minter and Gutierrez-Campos coming up. In those cases, the government readily concedes that constitutionalized mers do exist, and they are only arguing whether New York's coverage limits to constitutionalized mers. So I think the government kind of argues both sides of the coin there. About the opiate derivatives, Naloxicol and the such, I think to accept the government's position would be to mean that Naloxicol could be a federal opiate derivative in one sense as a scientific matter, but somehow not be an opiate derivative in New York. I think that kind of also would defy the science behind it, where it's really a binary question of whether Naloxicol is or is not an opiate derivative. And then lastly, I think I wanna close by the three-methyl fentanyl. I think the government addresses it only in a footnote, page 33, footnote eight of the Deere brief, where they say, well, remand is necessary so an immigration judge can determine whether cis or trans three-methyl fentanyl are distinct substances from the federal regulation of three-methyl fentanyl and the optical isomers. Cis-trans isomers is simply another scientific name for geometric isomers. We know that from United States versus Pfeiffer, where the 11th Circuit broke down the various types of isomers. We know that by looking at different chemical dictionaries, which can tell us geometric isomers are also known as cis or trans isomers. So I think for the government to now request remand to determine whether cis-trans isomers of three-methyl fentanyl would answer the question of whether geometric isomers do exist, I think, again, would exceed or strain the scientific matter before us. I think this court has everything it needs to decide on the legal question. I think the legal question is also quite clear that there's statutory overbreath. Thank you, Your Honors. Let me just suggest we have the benefit of your supplemental briefing. I think a week should do it. December 14, 2022, I'd like, we would like both sides to file supplemental letter briefs of no more than 10 pages, double-spaced. I think that should do it. And we would benefit, of course, from at least an introductory, an introduction to the jurisprudence of categorical versus modified categorical versus non-categorical. This is a jurisprudence that has led to much good humor among commentators. And nevertheless, it still exists for at least a time before the Supreme Court, but probably, in my personal view, probably not for long. So I think we'd like to have an introduction to the categorical versus non-categorical or semi-categorical or non-categorical. Well, and then focus on the effect of Gibson, the case that was decided yesterday, December 6, 2022. And we wanna know how that case affects this case. Now, in connection with this large question of categorical versus non-categorical jurisprudence, there's one particular case I'd like to bring to your attention. Unfortunately, I don't have it readily at hand. I will try to have it transmitted, the citation transmitted to you later. But you may be aware of it since both of you are among the world's leading experts. I think it's fair to say that two of you are among the leading experts on this subject. There was an opinion written in the last term on a panel that I was joined by Judge Newman and I think Judge Parker. Judge Parker, this will be an easy way to find it electronically. Cabranes, John Newman, and Barrington Parker. And in particular, I invite you to look at the appendix, which is provided in that opinion. I have seen a smile over here suggesting that it might have been seen already. That appendix is directed to the Congress of the United States with respect to how this eccentric body of jurisprudence might be reconsidered. And this has been done on a few occasions by the Court of Appeals, but this was the most recent one in which an issue was essentially conveyed to the Congress with an invitation that they address the issue. So if you find that case, as I think you will with the information I've given you, I want you to look at that and think about it and perhaps indicate the extent to which the kind of legislative action recommended by the panel would or would not affect the disposition of this case. The answer may be that it's not directly relevant to this case. But the appendix was designed to address a broad swath of the categorical versus non-categorical or modified categorical. And I say broad swath because we're talking here about its application to the immigration statutes. It also applies significantly to the sentencing guidelines. Kind of a separate issue. So I just invite you to think of it in those terms. Thank you very much. It's great to have seen you both. It's good to have expert counsel on arcane subjects before us. We'll turn now to DHIP LLC versus Fifth Third Bank. Thank you. Mr. Riefman. Good afternoon, your honors. May it please the court, Joshua Riefman from Dunning Riefman and McDonald for the appellant DHIP LLC. The district court in this case erred by finding that DHIP does not exist for purposes of suing or being sued and that it therefore could not maintain this action and therefore dismiss the action. The district court applied the 2016 Pennsylvania LLC statute which is the Pennsylvania Uniform LLC statute to a dissolution filing that was made in 2014. And even in doing so, even if the